

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| vs. ) | No. 03 C 5693 |
| ) | |
| JENKENS & GILCHRIST, P.C., a ) | |
| professional corporation, ) | |
| ) | |
| Respondent. ) | |

## MEMORANDUM OPINION AND ORDER

This action stems from the Internal Revenue Service's (IRS) ongoing investigation into Jenkens & Gilchrist's (J&G) development and sale of tax shelters, and its compliance with the Internal Revenue Code. The IRS' investigation also concerns the accuracy of tax returns filed by individuals who purchased J&G tax shelters, which were later identified by the IRS as potentially abusive. In August 2003, the government petitioned the court for an order to enforce summonses issued to J&G related to these investigations. Relying on Judge Kennelly's reasoning in United States v. Sidley Austin Brown & Wood LLP, 2004 WL 905930 at *1 (N.D.Ill. 2004), we denied J&G's motion to dismiss and to quash the summonses in our Memorandum Opinion and Order dated May 13, 2004. In the order enforcing the summonses we provided an opportunity for J&G clients whose files were subject to the summonses, to intervene and assert a privilege as to documents in their files before J&G turned them over to the government. Only one group of clients moved to intervene, members of the Welles family: David Welles, Sr., Georgia Welles, David Welles, Jr., Virginia Welles Jordan, Jeffrey Welles, Peter Welles, and Christopher Welles. These intervenors seek to assert an attorney-client

privilege as to eleven documents[1] in their client files. The government now moves to compel production of these documents, arguing that the privilege does not apply. The government's motion is granted.

In the Seventh Circuit, the principles articulated by Dean Wigmore in 1904 govern the applicability of the attorney-client privilege. The privilege exists "(1) [w]here legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived." United States v. Evans, 113 F.3d 1457, 1461 (7th Cir. 1997)(citing 8 JOHN HENRY WIGMORE, EVIDENCE IN TRIALS AT COMMON LAW § 2292 (John T. McNaughton rev. 1961)). The burden of proving these elements rests with the party seeking to invoke the attorney-client privilege, Evans, 113 F.3d at 1461, which is narrowly construed as it contravenes the search for truth. United States v. White, 970 F.2d 328, 334 (7th Cir. 1992).

In its motion to compel, the government argues that the documents at issue are not protected by the attorney-client privilege because (1) there was no attorney-client relationship between J&G and the intervenors, (2) there was no expectation nor maintenance of confidentiality concerning the documents, and (3) even if there was a valid privilege it was waived when J&G produced copies of the relevant documents from the file of a non-intervening co-participant in the transactions. We will address each of these arguments in turn, starting with the government's assertion that the intervenors and J&G did not have an attorney-client relationship from which a privilege could arise.

---

[1] These eleven documents, identified as Intervenor Documents A-K, have been submitted to the court for an *in camera* review.

An attorney-client relationship does not require a formal contract nor the payment of fees, rather, it "'hinges upon the client's belief that he is consulting a lawyer in that capacity and his manifested intention to seek professional legal advice.'" Westinghouse Electric Corp. v. Kerr-McGee Corp., 580 F.2d 1311, 1317, 1319 (7th Cir. 1978)(citing MCCORMICK ON EVIDENCE § 88 (2d ed. 1972)). Both the attorney and client must consent to the formation of the relationship. McCook Metals L.L.C. v. Alcoa, 2001 WL 58959 at *2 (N.D.Ill. 2001). The government maintains that J&G and the intervenors did not form this relationship because J&G specifically disclaimed a fiduciary relationship with the intervenors in a confidentiality agreement that was used in conjunction with the sale of its tax shelters.

Though J&G has not produced confidentiality agreements signed by the intervenors, the government argues that the record supports the conclusion that the agreements governed the relationship between J&G and the intervenors.[2] The government contends that confidentiality agreements in the record, signed by others who purchased J&G tax shelters, reveal that the law firm required the agreements in order to protect its intellectual property in the tax transactions. John Ivsan, a Shumaker, Loop & Kendrick attorney working with the intervenors, requested that Donna Guerin, a J&G attorney, send him J&G's confidentiality agreements for Jeffrey Welles, David Welles, Sr., and David Welles, Jr. to sign. Agreements in their names were sent to Shumaker. The confidentiality agreements addressed to Jeffrey, David Sr. and David Jr. provided: "Undersigned and J&G are acting solely as independent contracting parties, and neither party shall be deemed to be the agent or fiduciary of the other."

---

[2] The intervenors confuse the issue by arguing that their longstanding attorneys, Shumaker, Loop, & Kendrick (hereinafter Shumaker), who informed the intervenors as to J&G's tax strategies, never required "prospective investors to sign a confidentiality agreement between the prospective investor and [Shumaker] before disclosing the Strategy to them." The relevant inquiry is not whether intervenors had to sign a confidentiality agreement as between them and Shumaker, but as between them and J&G.

J&G's disavowal of both agency and a fiduciary relationship with the intervenors preempts the formation of an attorney-client relationship. As an attorney-client relationship rests on agency and fiduciary duty, *see* Doe v. Wachovia Corp., 268 F.Supp.2d 627, 635 (W.D.N.C. 2003)("There can be no attorney-client relationship without a fiduciary relationship."), the parties' rejection of these connections reveals their lack of consent to such a relationship. Furthermore, given this language, a signatory to the confidentiality agreement could not harbor a reasonable belief that he was seeking legal advice from an attorney who was acting in that capacity.

The intervenors argue that the confidentiality agreement is not inconsistent with their later development of an attorney-client relationship with J&G. Indeed, the confidentiality agreement did not impede the signatories from subsequently altering the nature of their relationship and, ultimately, the intervenors and J&G did assume an attorney-client relationship through the execution of an engagement letter on February 9, 2001. However, ten of the eleven documents at issue – intervenor documents A through J – were created in 2000 before the execution of the engagement letter. Only document K was communicated after the intervenors and J&G established an attorney-client relationship.[3] Thus, the pertinent question is whether the intervenors and J&G had an attorney-client relationship after the presentation of the confidentiality agreements in December 1999, but before the execution of the engagement letter in February 2001.

The intervenors contend that, despite the language of the confidentiality agreement, their relationship with J&G changed immediately upon the transfer of confidential information

---

[3] Document K is dated January 2, 2001, but the parties appear to agree that it was communicated to the intervenors on February 13, 2001, after the execution of the J&G engagement letter.

between their attorneys at Shumaker and J&G. Even though the intervenors acknowledge that the existence of an attorney-client relationship for purposes of the privilege hinges upon the client's belief that he is consulting a lawyer in that capacity, they rest their argument on Ivsan's affidavit and their later engagement letter. Ivsan's statement that he believed the intervenors "might ultimately receive legal advice and a legal opinion from J&G," provides no support as to the intervenors' belief regarding their relationship with J&G after they were given the confidentiality agreements. Before the intervenors executed their engagement letter with J&G, the clearest declaration of their understanding of their relationship with J&G comes from the confidentiality agreement. While the confidentiality agreement did not foreclose the possibility that the relationship between J&G and the intervenors might later change, the intervenors have not presented any evidence that they would have believed they were getting legal advice from J&G prior to engaging their services on February 9, 2001. For this reason, documents A-J are not privileged.

The government further argues that all of the relevant documents are outside the scope of the attorney-client privilege because the intervenors did not seek legal advice from J&G, but were merely purchasing a J&G tax product that it sold for a fixed percentage fee. The attorney-client privilege does not apply to business or investment advice provided by an attorney; it "'protects only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege.'" Matter of Walsh, 623 F.2d 489, 494 (7th Cir. 1980)(quoting Fisher v. United States, 425 U.S. 391, 403 (1976)). This ensures that a client cannot buy a privilege by hiring an attorney to do something that a non-lawyer could do. Wachovia Corp., 268 F.Supp.2d at 635. The government maintains that J&G's interest in selling alleged "cookie-cutter" tax shelters to the intervenors is contrary to the provision of legal

advice. Thus, it argues that even though document K – J&G's opinion letter – was provided to the intervenors after they executed an engagement letter with the law firm, it still does not enjoy a privilege because it is not legal advice, but rather part of J&G's packaged tax product. We need not determine whether document K, J&G's legal opinion, was merely part of a packaged transaction and therefore outside the scope of privilege, because the attorney-client privilege does not apply for another reason – lack of confidentiality.

The government argues that the relevant documents are not privileged because the intervenors have not shown that the information communicated was intended to be kept confidential, nor was it kept confidential. The government asserts that since the information was meant to be used for the preparation of tax returns and/or the creation of a tax shelter that required the participation of a third party, it was expected to be shared. In particular, it contends that document K was prepared not as confidential legal advice, but in order to assist the intervenors with the preparation of their tax returns. In <u>United States v. Lawless</u>, 709 F.2d 485, 487 (7th Cir. 1983), the court found that if information is transmitted to be used on a tax return, "such a transmission destroys any expectation of confidentiality which might have otherwise existed." The court further stated that the loss of privilege applied not only to the transmitted information, but also "'to the details underlying that information.'" *Id.* at 488 (quoting <u>United States v. Cote</u>, 456 F.2d 142, 145 (8th Cir. 1972)). The government has produced evidence that document K was intended to be used for the intervenors' preparation of tax returns. Letters sent by J&G to the intervenors on February 13, 2001, the same day they were sent copies of document K, state, "Enclosed please find our tax legal opinion to complete tax returns for the above referenced entities with respect to certain transactions in which they were involved during 2000." J&G's letter and "tax legal opinion" concerning Stobie Creek

Investments, a limited liability corporation formed by the intervenors to employ the potentially abusive tax strategy, were sent following Ivsan's request on July 18, 2000, that the law firm review a short year return for Stobie Creek. The intervenors counter that the government has provided no evidence that J&G's opinion was actually used to prepare a tax return. Their response does not rebut J&G's statement as to the expected use of document K and fails to support a finding that the communication was made in confidence. *See* Lawless, 709 F.2d at 488 ("While this Court did not have the estate tax return before it, and the district court did not consider whether the information on the documents were in fact on the return, disclosure of tax information effectively waives the privilege . . . ."). The intervenors have not satisfied their burden of proof regarding the confidentiality of document K.

Finally, the government argues that even if documents B through J are privileged, the privilege has been waived because J&G already produced copies that were placed in the file of a non-intervening co-participant in the tax shelter. The attorney-client privilege rests with the client, who generally must voluntarily waive the privilege. 2 CHRISTOPHER MUELLER ET AL., FEDERAL EVIDENCE § 201 (2d ed.). J&G's production of copies of these documents from a non-intervening client's file does not constitute a waiver on the part of the intervenors, for they have not consented to this disclosure but, rather, have objected to it. Nonetheless, documents A through K are outside the scope of the attorney-client privilege for the reasons explained above.

## CONCLUSION

For the foregoing reasons, the government's motion to compel is granted.

JAMES B. MORAN
Senior Judge, U. S. District Court

March 10, 2005.